IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____


UNITED STATES OF AMERICA


-vs-


DEREK HAGEN,

Defendant.

_____


**DEFENDANT'S SENTENCING SUBMISSIONS**

Case No. 22-cr-06099-EAW


Respectfully Submitted,

Jessica Lauren Naclerio, Esq.
Attorney for Defendant, Derek Hagen
Trevett Cristo
500 Canal View Blvd., Suite 600
Rochester, New York 14623
Phone: (585) 454-2181
Email: jnaclerio@trevettcristo.com

JESSICA LAUREN NACLERIO, attorney for Derek Hagen, affirms as follows:

I am an attorney licensed to practice law in the State of New York and the United States District Court for the Western District of New York. I have been assigned to represent Derek Hagen and, as such, I am fully familiar with the facts and circumstances of this case. The factual representations made in this submission are based upon my review of records collected, research conducted, conversations with Derek and others, a review of the Presentence Report ("PSR"), *see* ECF No. 49, and the following exhibits:

| | | |
|---|---|---|
| Exhibit 1: | Derek's Writings | |
| | a: | Things that Happened to Me: An Account of Some Life Defining Moments (TTHTM) |
| | b: | Understanding What Happened to Me: Using Research and Other Resources to Understand My Problematic Behaviors and How to Change Them (UWHTM) |
| | c: | My Safety Plan (MSP) |
| Exhibit 2: | Letters of Support from Family and Friends | |
| | a: | Mariah Hagen |
| | b: | Erica Frith |
| | c: | Jordan Hagen |
| | d: | Alexis Thomason |
| | e: | Zachary Frith |
| | f: | Tina Hagen |
| | g: | Richard Hagen |
| | h: | Timothy Kirsop |
| | i: | William (Billy) Moll |
| | j: | The Moll Family |

k:      Andrew Smead

Exhibit 3:      Mitigation Report & Addendum by Dr. Robert Smith

Exhibit 4:      Treatment Updates

      a:      Traci Fulmer of FLACRA

      b:      Terri Robinson of Safe Harbors of the Finger Lakes

      c:      Safe Harbors of the Finger Lakes Certificates

Exhibit 5:      Letters to & From Sandy Wurtele

      a:      Derek's Letters to Sandy

      b:      Sandy's Response

Exhibit 6:      Letters from 12 Step Support Groups

      a.      Derek's Initial Letters

      b.      Brian S.

      c.      Ron L.

Exhibit 7:      Edovo Transcript

Exhibit 8:      Extrinsic Corroborating Evidence

## Introduction

"Sentencing is perhaps the most important responsibility of a trial judge, and surely the most difficult. Emotion is one reason it is so difficult. The competing considerations evoke strong sentiments – anger, indignation, shame, sorrow, grief, despondency and hope. The sentencing judge is not immune from these emotions." Hon. Denny Chin, Sentencing: A Role for Empathy, 160 Univ. of Pennsylvania L.R. 1579 (2012) (internal citations omitted).

The factual allegations of this case include some of the worst crimes that can be perpetrated against the most vulnerable victims: children. As the Government sets forth in its

sentencing statement, *see* ECF No. 50, Derek's conduct was "repulsive and evil." He "sexually abused two children with whom he held a close relationship and over whom he routinely exercised supervisory control as a babysitter."[1] The extent of Derek's harm and the nature of his actions are not in dispute. Derek himself acknowledges this throughout his writing. It is beyond the need for elaboration that the Government's interest in safeguarding the physical and psychological well-being of minors is compelling. The production and distribution of CSEM is a serious crime that threatens real, and frequently violent, harm to vulnerable victims.

This memorandum is in no way intended to mitigate the serious harm caused by Derek's actions. Rather, it is intended to assist the Court in making an individualized assessment in administering a sentence that is sufficient but not greater than necessary. This Court, the Government and the community should not forgive Derek for what he did, but it can treat him with understanding and appreciation for the difficulties he has encountered and the process of rehabilitation that he is engaged in.

To say that Derek has made the most of his time incarcerated is an understatement. I have never encountered a defendant with such insight into his actions, a desire to understand how he came to offend and what he can do to insure that he does not offend again. Over the past two years, Derek has engaged in a process of extreme self-reflection and undergone a complete metamorphosis.

This case is uniquely challenging because the Court must confront the horrific allegations with the man who appears before Court for sentencing. It seems impossible that they are the same person. Derek, through his research, writing, recovery, and actions has attempted to demonstrate to this Court how this transformation is possible. The old adage "actions speak

---

[1] Throughout this sentencing memorandum and Derek's writings, these victims are referred to as V1 and V2 to protect their privacy.

louder than words" is especially relevant here. I expect that this Court has heard from many defendants who have acknowledged the harm they caused, expressed remorse for their actions and promised to never offend again. The Court is faced with determining whether these individuals are sincere. "To some extent, a sentencing judge is [] trying to predict the future, as she must determine whether the defendant really learned his lesson, whether he is likely to break the law again and whether he will finally turn his life around." Hon. Denny Chin, Sentencing: A Role for Empathy, 160 Univ. of Pennsylvania L.R. 1576 (2012). Derek's work demonstrates his rehabilitation. His actions speak louder than his words.

The statutory factors set forth in 18 U.S.C. § 3553 reflect the traditional goals of punishment: retribution, deterrence, incapacitation and rehabilitation.[2] These abstract goals are realized in more concrete terms by asking questions like: How serious was the criminal conduct? How culpable was the defendant and what was his role? What motivated him to break the law? Were there any mitigating factors? What is his state of mind now? Is he remorseful? Did he break the law before? Is he likely to do it again? Does he deserve another chance? Will he redeem himself? What is the impact on the defendant's family? The purpose of this submission is to assist the Court in answering some of these questions.

Derek's writings, which are attached as Exhibit 1, were entirely driven by Derek's desire to understand how he reached the point where he produced CSEM and committed contact offenses; how he strayed so far from his moral compass that he caused lasting harm to countless victims, some he knew, some he will never know. I have reviewed with Derek each and every page of his submissions; however, his writings are entirely of his own doing. These writings and

---

[2] *See Graham v. Florida*, 130 S. Ct. 2011, 2028 (2010).

exhibits are not an excuse for Derek's behavior, rather they illustrate the time, commitment and dedication that Derek has put forth in beginning the process of rehabilitation.

Derek's writings, taken in conjunction with the letters of support from his friends and family, the mitigation report by Dr. Smith, treatment updates and other exhibits serve as the foundation for imposing a sentence below the Guidelines range, specifically 15 years imprisonment which is the statutorily prescribed minimum punishment for a violation of 18 U.S.C. § 2251.

## Background

On September 7, 2022, Derek Hagen pleaded guilty to an information charging him with one count of production of CSEM[3] and one count of possession of CSEM. *See* ECF No. 21, 22. Derek's sentencing is scheduled for February 5, 2025. In the plea agreement, the parties anticipated an advisory Guidelines range of 600 months imprisonment based on a criminal history category I and a total offense level of 43. Each party reserved the right to recommend a sentence outside the Guidelines range. *See* ECF No. 22, ¶¶ 20-21. The PSR includes the same Guidelines calculation as the plea agreement. *See* PSR ¶ 139. The defense does not object to the Guidelines calculations in the PRS or any other aspect of the PSR, but believes that a prison sentence substantially below the Guidelines range is warranted for the reasons set forth below.

## Legal Standard

A court must impose a sentence that is "sufficient, but not greater than necessary," to serve the statutory sentencing goals of retribution, deterrence, incapacitation and rehabilitation.

---

[3] This memorandum will use the term "child sexual exploitation material (CSEM)" and will not use the term "child pornography." According to Piche and Schweighofer, "the rationale for this terminology is that CSEM is not simply another type of pornography depicting consenting adults. The term CSEM clearly conveys that such imagery necessarily involves the sexual exploitation of a child, and it is hoped that the use of such terminology will help clients more readily understand the harm that results from the viewing of such images." Cybersex Unplugged: Finding Sexual Health in an Electronic World, page 3.

18 U.S.C. § 3553(a); *Tapia v. United States*, 564 U.S. 319, 325 (2011). The importance of individualized sentencing is a central theme in federal criminal law. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate…the crime and punishment to ensure." *Koon v. United States*, 518 U.S. 81, 113 (1996).

Following *Booker*, the Guidelines are true guidelines, advisory and not mandatory in nature. They are something to which the Court should give "respectful consideration" *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008); however, a court "may not presume that a Guidelines sentence is reasonable for any particular defendant." *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010).

The Second Circuit has recognized that the United States Sentencing Commission's approach to CSEM is "fundamentally different" from its guidance within respect to most other offenses and, consequently, "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee,* at 184. Specifically, the *Dorvee* court explained that "sentencing guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. However, the Commission did not use this empirical approach in formulating the Guidelines for [CSEM]." *Id*. (citation omitted). The guideline calculation in this case demonstrates how the sentencing enhancements operate to hyperinflate-sometimes in a redundant fashion-the guidelines offense level.

As Judge Pooler articulated in a 2016 dissent, "must of the *Dorvee* court's criticism of the [CSEM] guidelines applies to the guidelines for production offenses as well. As with the guidelines for trafficking in [CSEM] found in Section 2G2.2, the Sentencing Commission did

not use an empirical approach to develop the production guidelines found in Section 2G2.1. Instead, the Commission has increased the base offense level and added enhancements for production offenses 'usually as a result of congressional directives.'" *United States v. Brown*, 843 F.3d 74, 89 (2d Cir. 2016) (Pooler, J., dissenting).

In fiscal year 2019, production offenders received an average sentence of almost 23 years (275 months), ranging from one year to life imprisonment. Furthermore, over three-quarters (78.0%) were convicted under a statute carrying at least a 15-year mandatory minimum penalty. A majority of child pornography production offenders, however, received a variance below the applicable guideline range (57.2% of the 512 cases). Sentencing Commission 2021 Report on the Federal Sentencing of Child Pornography Production Offenses.[4] It should be noted that "the vast majority of fiscal year 2019 child pornography production offenders (80.9%) were sentenced for an offense that involved sexual contact of a minor." (Commission Report at 6). Thus, as disturbing as the facts in this case are, they are typical of individuals sentencing under the Guidelines and contained within the statistics cited above.

In cases such as this one, involving sexual conduct, the politically rather than empirically driven harshness of the base guidelines are further exacerbated by the application of USSG § 4B1.5 which piles on an additional 5 level enhancement. *PRS*, ¶ 125. This enhancement is likewise a creature of politics as the Commission acknowledges in the background information for § 4B1.5: "section 632 of Public Law 102-141 and section 505 of Public Law 105-314 directed the Commission to ensure lengthy incarceration for offenders who engage in a pattern of actively involving sexual abuse or exploitation of minors." In a particularly cruel irony here, the structure of § 4B1.5 is such that Derek would face a *lower* recommended guideline range if he

---

[4] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf

had a prior history of committing sexual offenses. To say that another way, Derek's guideline range is **higher** because he does not have a prior sex offense conviction.

To elaborate, § 4B1.5 has two subsections:

(a) applies in any case in which the defendant's instant offense of conviction is a covered sex crime, § 4B1.1 (career offender) does not apply, and the defendant committed the instant offense of conviction subsequent to sustaining at least one sex offense conviction.

(b) applies in any case in which the defendant's instant offense of conviction is a covered sex crime, neither § 4B1.1 nor subsection (a) of this guideline apply and the defendant engaged in a pattern of activity involving prohibited sexual conduct.

In this case, subsection (a) does not apply because Derek does not have a prior sex offense conviction. Thus, Derek is subjected to the enhancement under subsection (b). Subsection (b) does not create a minimum floor like subsection (a), rather, it increases the offense level by 5 levels. The effect here is to push Derek's offense level well off the chart and recommend a life sentence under the guidelines.

Additionally, for the calculation of Count 2, Derek received a total of 6 additional levels because of the age of the minors depicted. ¶¶ 112, 115. He received a two level enhancement under § 2G2.1(b)(1)(A) and an additional four level enhancement under § 2G2.1(b)(4)(B). By the nature of the enhancements, the specific offense behavior accounted for in § 2G2.1(b)(4)(B) is necessarily accounted for in the two level enhancement of § 2G2.1(b)(1)(A). Due to the nature of the offense at issue, one of these enhancements nearly always applies to characteristics which are undoubtedly abhorrent; however, a six level enhancement – two of which are reductant – is excessive.

Lastly, the cumulative effect of these enhancements is that they operate to deprive Derek of any meaningful benefit for accepting responsibility. Derek's total offense level calculation is

53. *PSR*, ¶ 125. Even accounting for a reduction of three levels based on Derek's acceptance of responsibility, Derek's offense level remains above the 43 level threshold.

Though correctly calculated, the guidelines vastly inflate the base offense level in this case such that Derek received no actual consideration for pleading guilty and accepting responsibility in a case where that is an essential part of rectifying his acts and relieving the Government of the burdens of litigation.

Pursuant to the Sentencing Reform Act of 1984, Derek understands that the Court must consider, but is not bound by the Sentencing Guidelines. As part of the plea agreement, both parties reserved the right to recommend a sentence outside the Sentencing Guidelines range. *Plea Agreement*, Dkt. 22, ¶ 21. Derek urges this Court to exercise its authority under *Booker* and sentence him to a non-guideline sentence.

<u>Discussion</u>

Due to the incredible work produced by Derek, *see* Exhibit 1, the following information is intended simply to supplement his writings as I believe they speak for themselves. I assume the Court's familiarity with the § 3553 factors and the legal standards set forth above. Also, the exhibits attached include intimate details of Derek's life. I will refer to these obliquely to avoid placing those details in the public record. Lastly, attached as Exhibit 8, the Court will find a summary of the extrinsic corroborating evidence of many of the events that Derek and his family discuss.

The real story in this case is not what led Derek to commit these offenses – although he does grapple with this throughout his writings – the real story is the effort that Derek has made to look inward, to earnestly begin the process of rehabilitation, to demonstrate authentic remorse and to take full and unqualified responsibility for his actions. Derek's efforts at achieving insight

in his conduct demonstrate his commitment to rehabilitation. His sister-in-law Alexis said it best, "[Derek's] ongoing efforts to tackle his personal challenges and his focus on self-development reflect a deep desire to contribute positively to his community and make amends where needed."[5]

### Letters from Derek's Family

A common theme throughout the letters from Derek's family was that the Derek they once knew had returned. Said another way, the Derek that stands before the Court today has returned to the man God intended him to be, not the monster he had become. In speaking about the time of the instant offense, when Derek's drug use was at its worst, Mariah writes, "I knew my brother was in there somewhere, I just couldn't dig him out." His older sister Erica remarked that "Derek has been rehabilitating himself and taking classes and taking advantage of as many programs as he can to not only continue educating himself but to show he is willing to do what he needs to do to show *the person he is now is not the same person he was on drugs that lead him down a dark path*..." Derek's little brother Jordan notes, regarding Derek's acts of self-improvement over the past two years, "it is through these efforts that I am seeing the brother I grew up with—the one I admire—rather than the one I worried about from a distance."

Derek's parents, Tina and Richard, share similar sentiments in their letters as well. They state that one of the positive effects of Derek's incarceration has been the reemergence of the son they once knew and lost. Tina remarks, "that is the only part of jail I am thankful for. His hard work has restored the person his family knows and loves. I am proud of the man before you as he has returned to the child I know as my beloved son, Derek. For a few years this person disappeared, and a stranger was left behind." Discussing the time when Derek's drug use was at

---

[5] The following quotes from Derek's family are taken from their letters of support. *See* Exhibit 2.

its worst and he engaged in the production of CSEM, Richard writes "my son was gone; [however] the son I know is back, which is one positive I have out of all of his incarceration; my son has returned. Clear headed, bright, articulate and kind to a fault at times." Derek has been restored to the kind, compassionate, helpful son that disappeared many years ago.

The choices that Derek made during the period of the instant offense alienated him from his family. His young brother Jordan notes that "over the past few years, I have gotten to know him more deeply than I ever imagined." The Derek that everyone knew and loved was gone, but throughout this process – his arrest and subsequent incarceration – Derek has returned. Derek's transformation did not stop with him; his commitment and dedication to rehabilitation has also inspired those around him.

Jordan remarks, "Derek's transformation is evident in his actions and mindset," that "the man before you today is not the same person who committed the crimes presented in this case. He has grown into a better version of himself through hardship and accountability. Derek's determination to make positive changes, no matter the circumstance, inspires me to be a better person."

Derek's recovery shined a light on the dark parts of the Hagen family that no one ever looked at. Derek's self-reflection and honest self-appraisal has placed his entire family on a different path.

Mariah found the strength to begin her own recovery journey from the abuse that she experienced as a child. She writes, "I have finally been able to talk about it and Derek helped me find so many answers I've been looking for. I never felt comfortable having these conversations until Derek was arrested. He's helped me acknowledge that it's okay that I'm hurt and though I've chosen forgiveness, he accepts that I know he has to be punished and held accountable."

Derek's sister Erica also discusses the abuse that she experienced as young girl at the hands of her paternal grandfather. These were dark secrets that were hidden in the Hagen family past; they have now been brought to the light and the entire family can now begin the process of truly healing.

Derek's dad, Richard, writes about his own experience watching Derek's transformation. Richard reflects that "[he] strives to be a better man as Derek told me 'Dad, we all must be better human beings and kind to one another'." Derek's sister-in-law, Alexis, remarks that "I have been continually inspired by his dedication to both his personal and professional development." Alexis is also Derek's accountability partner. She writes, "recently, Derek asked me to serve as his accountability partner, a role in which I help him monitor his progress on and offline to ensure he stays on a responsible path. He chose me for this role because he values having an honest and unbiased perspective. This decision highlights his sincere dedication to accountability and his determination to uphold high standards of behavior."

As a result of his actions, Derek's entire family has been forever changed. They have been forced to confront the reality of Derek's actions and they have embarked on a path of healing that may not have been possible without Derek's arrest. "I can't believe we got here. With the work he's done on himself and the work we've done together as a family. We can get through." Mariah writes. She continues "I've seen so much growth and change and healing in Derek the past two and half years. Derek has made this easier on me, because he reminds me when I lose track of my thoughts that he does need to be in jail. He has never once thought that he didn't deserve this. When we talk about sentencing he always says I know I deserve to be punished. I can't imagine sitting where he is and saying that. That's a smart man. I truly just ask for consideration. For his rehabilitation, hard work and growth."

As I read Derek's writings, his earnest remorse is clear. This remorse is also something that his family observed. Alexis writes, "I have seen his remorse for those he hurt and his respect for us all to process our emotions in our own way and our own time." This sentiment appeared as a second theme in his family's letters: Derek has allowed, and supported others, as they experience their own feelings – grief, anger, sadness, regret – around this incident. Mariah notes, even "where he knew I felt so much betrayal and hurt, he assured me it was ok to feel those things." By embarking on this process of recovery, Derek's growth has encouraged and supported those around him in their own healing. Richard notes, "through this, he has stood strong and continues to heal all around him.

It is also worth noting that a study conducted[6] by Thomas J. Mowen, Richard Stansfield and John H. Boman, IV, concluded that "family support appears to relate to prosocial reentry outcomes not because of emotion or interactional bonds, but because families provide for the basic needs of returning individuals. Instrumental family support mechanisms such as providing housing and financial support appear more salient in promoting prosocial reentry outcomes than mechanisms of emotional or interactional support."

These findings demonstrated that instrumental…support related to significantly lower odds of reincarceration and lower levels of substances use and criminal offending. In Derek's case, he is lucky enough to have not only the emotional and interactional support of his family, but also their instrumental support. Jordan writes, "my wife and I would feel entirely comfortable

---

[6] <u>Family Matters: Moving Beyond "If" Family Support Matters to "Why" Family Support Matters during Reentry from Prison</u>, J Res Crime Delinq. 2019 July; 56(4): 483-523. Doi:10.1177/0022427818820902.

welcoming him into our home because we know the man he truly is and the work he continues to put into bettering himself."[7]

*V1 and V2*

Based on the conversations that are included in the PSR, it is easy to wonder the extent of the abuse that occurred. After Derek's arrest, both V1 and V2 underwent forensic interviews at the Justice for Children Advocacy Center. Neither V1 nor V2 made any disclosures regarding any sexual (or physical abuse).

Both V1 and V2 also underwent a physical examination. V1's physical examination revealed a hymen with no "lacerations, tears or scars." This indicates that there is no visible evidence of penetration or trauma to the area. An examination of V2's genitals revealed no lacerations, tears or scars. An examination of both V1 and V2's rectal area revealed no lacerations, tags or scars.

It is undeniable that contact offenses occurred and occurred on more than one occasion, but the physical examination revealed that the abuse did not cause lacerations, tears, tags or scaring to either V1 or V2's genitals. Regarding V1 and V2 today, a family member writes "now, as awful as it is…with this situation involving Derek included, I am the best *** I can be to these children. I don't go to bed anymore wondering if I've done enough. They are happy, healthy, extremely loved and the best part…healing. We are healing together, as a family. We have done so much to work on our mental health together."

---

[7] In discussing this issue, Tina wrote in an email to me "if I am on earth he will live with me, and I will financially support him and supply him a car if not he will be left monies in my will and my son Jordan has agreed to supply housing and use of transportation." I know that it is a very real fear of Tina's that she will not live to see Derek again outside of prison.

Based on the investigation and my conversations with the family, it appears that V1 and V2 do not have any memory of the abuse they suffered.[8] In *United States v. Brown*, 843 F.3d 74, 87 (2d Cir 2016), the court observed that "…one of the girls was asleep at the time of Brown's abuse and, as of sentencing, remained unaware that she was a victim of his crimes. This child's lack of knowledge that Brown violated her in an atrocious manner does not mean that she is any less of a victim of his crimes. Of course she is. But her life, hopefully, has not been destroyed." This information is included to inform the Court of the about the current well-being of V1 and V2.

*Derek's Recovery Work*

During one of my first meetings with Derek in early 2023, I sat across the table from him in the library at the Yates County Jail. Derek had pleaded guilty approximately six months earlier and had begun to think about his eventual sentencing. He produced several pages of writing which consisted of an apology to his victims. Derek had absolutely no insight into his behavior, he minimized his conduct and blamed others for his possession, receipt, distribution and production of CSEM. I thought to myself "how am I ever going to advocate for him at sentencing? What will I even be able to say?" Although Derek never denied his behavior, I knew that he was in denial about the reality of his situation. He was fiercely protective of his family and his upbringing; he assured me that he had never experienced any trauma and that his behavior was all a result of his drug use.[9]

For better or worse, I confronted him and expressed my concern that, with his current perspective, I believed this Court would, appropriately so, sentence him to an extremely long

---

[8] This also appears to be true for V3 and the other children at the BCDC.

[9] It is my belief that Derek's drug use played a significant role in the instant offense; however, as his writing illustrates, his drug use was a symptom of his much deeper pain and trauma, not simply the problem.

term of incarceration. As the next several weeks and months unfolded, it was evident that Derek had *heard* me. He began asking me to send him scientific studies discussing CSEM offenders. He then asked to review the literature on the illicit and prescription drugs that he had abused. It was here that his recovery journey took off.

    One of the first things that Derek did was write a letter to Dr. Sandy K. Wurtele,[10] *see* Exhibit 5, co-author of <u>Developmental Experiences of Child Sexual Abusers and Rapists</u>. Simons, et al. Child Abuse & Neglect 32 (2008). Much to my surprise, Dr. Wurtele wrote Derek back and sent him copies of two workbooks. *See* Exhibit 5. The two workbooks were: Cybersex Unplugged: Finding Sexual Health in an Electronic World, W.M. Edwards, et al (2011) and Working with Offenders who View Online Child Sexual Exploitation Images, L. Piche, et al. (2023).

 

[10] https://en.wikipedia.org/wiki/Sandy_K._Wurtele (last accessed January 6, 2025)

Unfortunately, Derek was unable to accept the physical copies that Dr. Wurtele sent, but with the help of his Mom, he ordered new copies of the workbooks which he was able to have in jail.

Cybersex Unplugged: Finding Sexual Health in an Electronic World is a 206 page workbook that was created from a need for a current workbook addressing the common issues for cybersex compulsivity. In this book, the authors "break down the complex elements of treating cybersex problems into the basic elements for the individual to address." The authors take the individual through three stages: Problem Identification, Primary Treatment and Groundwork for Completing Treatment. Derek diligently worked his way through the entire workbook.[11]

Working with Offenders Who View Online Child Sexual Exploitation Images offers "evidence-based strategies rooted in the authors' clinical experiences, the workbook enables the practitioner and client to work productively together to address the issues that have led to their involvement with illegal sexual images." This is a 213 page workbook that Derek also successfully completed.

As Derek worked through the articles and workbooks, he was forced to confront the reality of his childhood and upbringing. He engaged in the arduous process of examining the things that happened to him in an effort to understand how he came to offend. "…A greater understanding of childhood adversities associated with this type of deviant behavior is desirable. Such an understanding will have important implications for the treatment of sexual offenders and *the prevention of sexual offending*."[12] It is important to note that in his writings Derek "does acknowledge the role that childhood trauma played in his life, [but] he does not blame it for his actions." *See* Dr. Smith's Addendum, Exhibit 3, page 1.

---

[11] Both workbooks are in my possession and I have reviewed them. Derek has thoroughly completed both of them.
[12] J.K.P. Lee et al. Child Abuse & Neglect 26 (2002) 73-92, 74

In addition to the recovery work that he engaged in alone, Derek sought outside help to assist in his healing process. Derek participated in both the FLACRA and Safe Harbors programming that was brought into the jail. *See* Exhibit 4. He took classes on Cognitive Behavior Therapy, one of the most effective treatment modalities for treating sexual offenders. *See* Exhibit 7. Lastly, he reached out to both Sexaholics Anonymous[13] and Sex Addicts Anonymous.[14] These are both 12-Step programs which attempt to address the root causes of Derek's problematic behavior. Derek corresponded with a sponsor in each program, *see* Exhibit 6, and completed the 12 steps. "Research in motivation psychology has repeatedly demonstrated that individuals will create profound changes and new possibilities when internally motivated." Cybersex Unplugged, page 10.

Derek concludes his writing by stating that "now that I have this cornucopia of information about factors that may contribute to CSEM use and how to overcome those factors, the best thing I can do it share my knowledge with others. I know I will never teach children again and that loss is warranted. But at my core, I will always be a teacher. Maybe the way I'm meant to evoke change is by teaching other incarcerated individuals how to be better versions of themselves."

"Though Derek has been adamant that he is engaging in this work solely because he wanted to be a better person, it would be unjust not to take it into account at sentencing. He is doing everything that we would want an inmate to do, taking an honest self-reflecting look at himself, engaging in every opportunity to work on his worst tendencies and developing actionable, realistic safety plans for his release. Derek is not the same person he was when first incarcerated, we ask the court to see that in his sentencing." *See* Dr. Smith's Addendum, Exhibit

---

[13] https://www.sa.org/
[14] https://saa-recovery.org/

3, page 2. Before imposing sentence, Derek urges this Court to consider who he is, who he has been and who he may be in the future.

*Unique Concerns for Derek While Incarcerated*

Research indicates that individuals convicted of sex offenses are often vulnerable targets for violence and abuse within correctional facilities. In fact, the Bureau of Prisons recognizes sex offenders as a vulnerable population within the prison setting.[15] Derek, who identifies as a gay man, faces increased risks of violence due to his status as an LGBTQ inmate.[16]

The harassment of Derek for his sexual identity and his crime of conviction began during his initial ride from the Federal building to the Livingston County Jail. He was told by other inmates that "he was going to get raped and get AIDS and then die in prison." The discrimination, alienation and victimization that LGBQT+ people can experience in general society is often mirrored and intensified in the prison environment.[17] Thus, the LGBTQ+ population in jail faces an increased risk of sexual, physical and emotional victimization from other inmates and staff.[18] "LGBTQ+ incarcerated individuals are six times as likely to be assaulted compared to heterosexual/cisgender prisoners." Harvey et al., 2021 page 2.

"There is evidence that homophobia is ubiquitous in men's prisons as a result of a 'corrections culture' of pronounced masculinity and rigid hierarchy … significant numbers of male prisoners can demonstrate higher homophobic disapproval than those in the general

---

[15]
https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp#:~:text=The%20Bureau%20recognizes%20sex%20offenders,of%20re%2Doffence%20after%20release

[16] https://www.americanbar.org/news/abanews/aba-news-archives/2024/06/lgbtq-inmates-need-protection/

[17] https://www.mdpi.com/1660-4601/18/17/9335 "Views and Experiences of LGBTQ+ People in Prison Regarding Their Psychosocial Needs: A Systemic Review of the Qualitative Research Evidence" Donohue, et al. 2021.

[18] Donohue et al., page 2.

population. This can result in the degradation, devaluing and victimization of LGBTQ+ prisoners who are not perceived as being 'masculine enough'."[19]

Since his arrest, Derek has spent most of his time at the Yates County Jail[20]; however, at the end of 2022, Derek was transferred to NE Ohio. While there, he was subject to hazing, verbal abuse and threats of physical violence due to his sexual orientation. Without any way to protect himself, Derek was placed in solitary confinement. This provided physical safety; however, it came at a grave cost. It is well documented that solitary confinement often results in tragic outcomes, including physical and mental health crises, increased incidence of violence and high rates of recidivism.[21] It is not uncommon for individuals who identify at LGBTQ+ and/or who have been convicted of sex offenses to resort to solitary confinement as the only way to ensure their safety.

This information is provided not in an attempt to garner sympathy for Derek, but to support his request for a recommendation from the Court that he be placed at FCI Elkton in Ohio or FMC Devens in Massachusetts. Although the First Step Act supports, and it is often requested that inmates remain in close proximity to their families and support systems, both Derek and his family would prefer that he be housed in a facility that is safe and far away rather than close and less safe for sexual offenders.

Although Derek's mental health has improved since his incarceration, his physical health has deteriorated. Since being incarcerated, Derek has developed a thyroid condition and high blood pressure. He requires regular medical care to manage both of these conditions. This

---

[19] Donohue et al., page 10.

[20] The first year of his incarceration Derek was housed in the Livingston County Jail.
[21] https://www.nami.org/advocate/how-solitary-confinement-contributes-to-the-mental-health-crisis/

includes regular blood tests to measure his TSH (thyroid-stimulating hormone). To treat his hypothyroidism, Derek is prescribed levothyroxine. Derek is prescribed losartan to control his high blood pressure.

In March of 2023, Derek was connected with Arron Schock of Yates County Jail Mental Health who he meets with approximately once per month. For his mental health, Derek is prescribed Paroxetine, commonly sold under the brand name Paxil, and Imipramine, commonly sold under the brand name Tofranil. Both medicines are prescribed as anti-depressants. Derek's imipramine dosage was increased in September 2023 after his meeting with Mr. Schock where Derek described that "he feels like it has become increasingly difficult to find the energy to do anything." Since increasing his dosage, Derek's mental health has remained stable.

*Similarly Situated Individuals Have Faced Significantly Lower Guidelines Sentencing Ranges*

In this case, the Guidelines range is so high, in part, because Derek pled guilty to two counts—one of production of CSEM and one of possession of CSEM. There is no question that Derek's conduct was egregious; however, other individuals in this district who have engaged in similar conduct have faced substantially lower maximum penalties and Guidelines sentences by pleading guilty, by agreement with the Government, to one count of either receipt or distribution. Had Derek been given the opportunity to plead guilty to one distribution count, the maximum penalty and the Guidelines sentence would be 240 months of imprisonment. *See* U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

In sentencing a defendant, a court must consider, among other things, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct. 18 U.S.C. § 3553(a)(6). In creating the Sentencing Commission and a guidelines system, Congress sought to "narrow [] the wide disparity in sentences imposed for similar criminal offences committed by similar offenders." Guidelines Part A.1.1. However, the Sentencing Commission has recognized the way its Guidelines are structured "affords prosecutors [the potential] to influence sentences by increasing or decreasing the number of counts in an indictment." Guidelines Part A.1.4.a. Although the Commission has attempted to write rules "with an eye toward eliminating unfair treatment that might flow from count manipulation," it has observed that sentencing courts can also address the issue by imposing sentences outside the Guidelines sentencing range. *Id.*

The following examples are offered in support of sentencing Derek to a below guideline sentence of 180 months in order to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. At the end of this section, there are two additional examples: one individual was on parole for Murder in the Second Degree at the time of his instant offense; and the other was approached by law enforcement on two separate occasions over a seven year period, questioned about his behavior, and undeterred, returned to distributing CSEM.

In March of this year, Corey Beasley pled guilty to one count of receipt of CSEM. *See* Plea Agreement, No. 23-cr-00075-RJA (W.D.N.Y), ECF No. 36 ¶ 1. The plea agreement's factual basis provides that Mr. Beasley produced multiple images of a minor in his care, including an image of her sleeping while holding his penis, images of her sleeping with no shirt on, and images of her naked in the shower. It also noted that for several months, Mr. Beasley gave the minor gummies before bed that made her very tired. The minor reported that Mr. Beasley showed her sexually explicit material, instructed her not to tell her mother what he was

doing, and touched her vagina on multiple occasions when he thought she was asleep. *See id.* ¶ 8. Mr. Beasley's plea agreement calculated the adjusted offense level as 42 and the guidelines sentence as 240 months. *See id.* ¶¶ 16, 18. Mr. Beasley was sentenced on December 10, 2024 to 180 months pursuant to Rule 11(c)(1)(C) plea agreement.

Other recent cases in which the defendant was permitted to plead guilty to one count, capping their Guideline sentence at 240 months, include: Shane Aurand, who produced CSEM of a 7-year-old he was babysitting, distributed images and pleaded guilty to one count of distribution, *see* Plea Agreement, No. 17-cr-00218-LJV-HKS (W.D.N.Y), ECF No. 22 ¶¶ 1, 9; Rebecca Woodin, who sexually abused a minor under her care, produced multiple images of CSEM involving that minor, distributed those images and pleaded guilty to one distribution count, *see* Plea Agreement, 21-cr-06030-EAW (W.D.N.Y.), ECF No. 71 ¶¶ 1, 7; and Roger Roberts, who induced a 13-year-old to create CSEM of herself and a 5-year-old, and pleaded guilty to one receipt count*, see* Sentencing Transcript, 22-cr-06030-EAW (W.D.N.Y), ECF No. 45, at 14-15, 17-19. Notably, all were sentenced to prions terms below the 240-month guideline. Mr. Roberts was sentenced to serve 204 months. Mr. Aurand and Ms. Woodin were each sentenced to serve 180 months.

These examples demonstrate the power the Government has was deciding how many counts a particular individual will be able to plead guilty to. This Court should account for the Government's charging decision in fashioning the appropriate sentence for Derek.

The inverse of this principle is also true—there *should* be sentencing disparities among defendants with different records or those that engage in dissimilar conduct. One such case is the case of Mr. Israel Rivera-Reyes (22-cr-06137-EAW-MJP). Mr. Rivera-Reyes pleaded guilty to

one count of production of CSEM.[22] He admitted to having sexual intercourse with a minor victim on an almost daily basis, knowing the victim was a minor, and producing multiple videos of himself engaging in sexual intercourse with a minor. At the time of his arrest, he was on parole for a March 1995 conviction for Murder in the Second Degree. Mr. Rivera-Reyes received a sentence of 292 months incarceration.[23] Prior to committing the instant offense, Mr. Rivera-Reyes had served a substantial sentence in the New York State Department of Corrections for his Murder in the Second Degree conviction. This period of incarceration did nothing to deter Mr. Rivera-Reyes and, while released on parole supervision, he committed the instant offense.

Consider also the case of Brett Marrapese.[24] In 2016, several years before the instant offense, Mr. Marrapese was approached by NYSP regarding CSEM which was uploaded from a City of Rochester fire station. *See* Statement With Respect to Sentencing Factors, ECF No. 42, page 2. Mr. Marrapese was not arrested. "But the defendant could not be deterred. In 2021, the NYSP confronted the defendant a second time after they received information that CSEM had again been uploaded from another Rochester fire station where the defendant worked. The defendant again escaped arrest, primarily by lying to police." *Id.* Mr. Marrapese, approached by law enforcement on two separate occasions prior to arrest, was undeterred. Despite nearly being caught twice, Mr. Marrapese continued to engage in the production, distribution and receipt of CSEM. Derek's reaction to being confronted by law enforcement could not have been more opposite: he attempted suicide.[25]

---

[22] This case is also an example of the Government allowing an individual to plead guilty to one count which had the effect of capping his statutory maximum at 30 years.
[23] https://www.justice.gov/usao-wdny/pr/paroled-murderer-going-prison-more-24-years-production-child-pornography
[24] 24-cr-06078-EAW
[25] On August 9, 2021, friends and family had not heard from Derek all day and went to check on him. He was found passed out on the bed. Scattered throughout the room are empty alcohol bottles. There are 46 loose pills found on his nightstand. It is believed that Derek overdosed on the combination of those pills and empty alcohol bottles. Billy

<u>Conclusion</u>

"Every act has both good and evil results. Every act in life yields pairs of opposites in its results. The best we can do is lean toward the light, toward the harmonious relationships that come from compassion with suffering, from understanding the other person."[26] In thinking about Derek's case, it is easy to focus solely on the horrendous acts he committed and the harm that his actions caused; however, as his family's letters and his writings illustrate, this is only part of the story. How do you reconcile the fact that these terrible acts occurred *and* that Derek's rehabilitation inspires, encourages and heals those around him? Derek himself wrestles with this duality in his writing. When the Hon. Denny Chin wrote that sentencing is the most difficult responsibly of a trial judge, I think this is what he meant. How can both of these things be true? And because they are true, what does that mean for sentencing?

The statutory minimum sentence of 15 years incarceration is a severe and significant sentence which will provide retribution, general and specific deterrence as well as incapacitation. Derek has already demonstrated that he is well into the process of rehabilitation by "engag[ing] in a level of self-reflection and behavior alteration that is exceptionally rare among any defendants." *See* Dr. Smith's Addendum, Exhibit 3, page 2. In a part of his writing that was not included in the final draft, Derek wrote "there is no predicting how a person will respond and react to life after incarceration. That's why I'm trying so hard now to take the appropriate steps to rewire thinking errors I've had in the past and put plans in place to be able to live a healthy, functional life when I am released. It's hard to say what more I will face in prison, but in the face of evil, I'm still committed to being a better individual."

---

(William Moll) was present at the hotel room when police arrived and provided a statement regarding his concern for Derek when he hadn't heard from him all day.

[26] https://en.wikipedia.org/wiki/Joseph_Campbell (last accessed January 8, 2025)

Regardless of the sentence imposed, Derek will not be released from prison, at the earliest, until the mid to late 2030s. A reality that he accepts as a necessary consequence of his behavior. However, a sentence of longer than 15 years unnecessarily postpones Derek's access to treatment in the BOP as well as access to more individualized mental health treatment that will be available to him only upon his release in the community.

The Court is also tasked with imposing a period of supervision release between five years and life. Derek requests that the Court impose a period of supervised release for 15 years. The special conditions of supervision will insure that Derek is closely monitored, counseled and treated for his addictions, to ensure that he never offends again.[27] The public will be protected as Derek will be under constant scrutiny for 30 years.

The statutory sentencing scheme under 18 U.S.C. § 2251, for an individual with no prior sex offense conviction, is 15 to 30 years. Sentences at or near the statutory maximum should be reserved for the "worst possible variation of the crime" committed by the most dangerous offender. *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir 2010). There is a real and legitimate human impulse to protect children from the most sordid crimes and a corresponding desire to incarcerate Derek for a substantially longer period of time. However, justice will be vindicated in this case by operation of law: a non-negotiable 15-year mandatory minimum sentence.

Derek does not have the adequate resources to afford a substantial fine and as such, it is respectfully requested that the Court impose no fine. Additionally, pursuant to 18 U.S.C. § 3014 it is understood that Derek can be subject to owe a $5,000 special assessment fee. Derek has been incarcerated for over three years and has no employment and no ability to pay this fine.

---

[27] Interestingly, the Proposed Special Conditions of Supervised Release contained with the PSR align with the Safety Plan that Derek has created for himself. *See* ECF No. 49, pages 46 to 48 and Exhibit 1c.

Therefore, it is respectfully requested that the Court deem Derek indigent as he does not have the funds to pay for this special assessment.

Wherefore, for the aforementioned reasons and considerations, Derek requests that this Court imposed a below Guidelines sentence of 15 years incarceration with 15 years supervised release to follow.

DATED:     January 8, 2025          Respectfully Submitted,
              Ontario, New York

                                            /s/ Jessica Naclerio
                                            Jessica Lauren Naclerio, Esq.
                                            Attorney for the Defendant
                                            Trevett Cristo
                                            500 Canal View Blvd., Suite 600
                                            Rochester, New York 14623
                                            (585) 454-2181
                                            jnaclerio@trevettcristo.com